PEABODY (VAN AMRINGE v.). See Case No. 16,825.

PEACO (UNITED STATES v.). See Case No. 16,018.

PEACOCK (UNITED STATES v.). See Case No. 16,019.

PEACOCK, The LOVETT. See Case No. 8,-555.

## Case No. 10,871.

### PEACON et al. v. The AMAZON.[1]

District Court, S. D. Florida. April, 1872.

SALVAGE—COMPENSATION—MATERIALS SAVED AFTER ABANDONMENT.

[1. Thirteen vessels, several of the smaller class, carrying 81 men, went to the assistance of a bark ashore on the Florida Reef. They did everything possible to get her afloat, but her bottom gave way. With peril to the salvor vessels, the cargo of 660 bales of cotton, and the materials and stores were taken out, and landed at Key Largo, and reshipped, the labor occupying 14 days, part of the time day and night without cessation. Held, that 35 per cent. on the net value of the cargo and 45 per cent. on the materials saved, after deducting usual costs, charges, and expenses, was a reasonable salvage.]

[2. For brass stripped from the bottom of a bark and other small articles of materials saved from a stranded vessel after the entire abandonment by both the master and original salvors, where the amount is small, 60 per cent. allowed.]

[This was a libel in rem by Benjamin Peacon and others against the cargo and materials of the Norwegian bark Amazon for salvage.]

LOCKE, District Judge. This vessel, laden with 660 bales of cotton, bound from Galveston to Liverpool, went ashore on the Florida Reef about 2 o'clock on the morning of the 14th of March, 1872, and 13 salving vessels, several of the smaller class, carrying 81 men, went to her assistance. When they first reached her she lay upon a rough, rocky bottom, upon an exposed portion of the reef, with the wind and sea directly abeam, and thumping heavily. They immediately proceeded to carry out an anchor and chain, and do everything that was possible to relieve her from the rocks, but while so engaged the vessel's bottom gave way, she immediately filled with water, and further exertions to get her afloat were abandoned, and the salvors at once proceeded to save cargo, materials, and stores. The distance from this port and the necessity of immediate action were so great, that they took a large portion of the cargo to Key Largo, a distance of seven miles, landed it, and continued to save other portions from the wreck, until all of the cotton, excepting three bales, together with all of the stores and materials, have been saved and brought to this port, leaving a loss out of the entire cargo of but three bales of cotton, and all saved in as good a condition as the circumstances of the case would possibly permit. On account of many of the vessels being small, and on that account unable to bring cargoes of cotton, great additional labor devolved upon the salvors in the landing and reshipping, and, as is alleged, they were occupied 14 days in the service, a portion of that time, until the property was saved

[1] [Not previously reported.]

from the vessel, day and night without cessation. The value and efficiency of the services rendered, and the zeal and good faith with which they were performed, is unhesitatingly acknowledged by the respondent, and the only questions raised at all in the hearing were the value of the property saved, and the special peril to which the persons and vessels of the salvors were exposed. The first has been settled by an appraisement of the cargo and sale of the materials; and the facts of the weather, as alleged in the libel, have been admitted by the answer. The question of ordinary, special, or imminent peril is now but a conclusion to be arrived at from a knowledge of those facts, and the degree of peril may be measured and determined thereby; and although it may not be claimed that there was extraordinary or imminent peril, yet I think the facts shown would justify a conclusion that there was a certain degree, especially to vessels.

The only question remaining to be settled by the court now is what amount of salvage should be awarded in this case. The property saved is comparatively small, and a liberal salvage would little more than compensate the salvors for the actual labor performed. The large number of men employed will reduce the shares materially, and although, under the necessary circumstances of landing and reshipping, I am not prepared to say that one man was employed more than necessary, yet the necessity was brought about in a great degree by the size of the vessels and the lack of facilities that the salvors had at command, and I cannot increase, on that account, materially, the salvage allowed. It has been claimed by the respondent that, although the salvors did all that they could, yet their inability to bring the cotton to this port direct, and the necessity of landing it in boats and rolling it through the water on shore, had, to a certain degree, added to the damage, and should be considered. If damaged as claimed, this damage has been estimated in the appraisement, and the salvors suffer, in a percentage salvage, to that amount. It is not in a small percentage more or less of salvage given that injures or relieves commerce, nor is it in the salvage that is given on property that is saved and brought into port that the greater losses occur, but in the great value either of vessels or cargo that is never saved and brought in. The salvage, then, should always be comparatively higher, when given, where there is the least loss, —first, where a vessel is relieved without great injury; next, where as great a proportion of the cargo is saved as possible, and in as good a condition. And although in the latter case a higher percentage may be given than in the former, the amount of property saved and the extra time and labor performed will, in all cases, be found to compensate for that difference. I shall,

therefore, in all decrees, endeavor to make it plain to the salvors that it is for their interest to save, if possible, vessels and cargo entire. Unfortunately for both parties, this case cannot be considered as belonging to the first class, but high up in the grade of the next.

Considering the facilities of the salvors, I consider this a meritorious case. The property has been saved from a total loss with much labor and in as short a time and with as little loss and damage as possible. The only question now is, to what amount, by the laws and usages of salvage, and the precedents of this and other courts, are the salvors justly entitled? It has been well remarked that "this question is alone within the discretion of the court"; but the discretion of the court is so restrained and limited by law, as established by precedent, that it becomes merely a question of law and its application, rather than a question of judgment; and by such law, so established, I shall at all times endeavor to be guided. Judge Marvin says: "On account of the necessity for the steady employment of a considerable number of men and vessels in the business of saving property shipwrecked on the southern coast of Florida, the court in this district has been in the habit of rewarding the services of the Florida wreckers with greater liberality than has usually been exercised with reference to similar services, either by other courts of the United States or by the high court of admiralty of England." The precedent of higher salvages having been long since established in this court, and I seeing no reason why the same practice should be abandoned or salvages reduced, do not consider myself compelled to go beyond its record to determine what the law would direct in such cases.

In an opinion delivered in the case of Pent v. The Ocean Belle [Case No. 10,961], by the judge who presided over this court from its establishment until 1863, and whose great learning and just and unquestioned decisions have given this bench a standing and reputation wherever commerce is known, he says: "The most usual rate of salvage in this court for saving cotton, where the ship was lost, has been 25 per cent. on the dry, and 40 per cent. on the wet, saved without actual diving, but taken from under water." Later, in the year 1865, in numerous cases, where vessels were lost and cargoes of cotton saved, the late lamented Judge Boynton, in view of the greater value of cotton, the great amounts of value saved, and the many persons, aside from the regular wreckers engaged in saving it, reduced these rates materially, but at the same time compensated the salvors for time, labor, and peril far greater than had these previous rates. My immediate predecessor, in decreeing salvage on property considerably less in amount and value, although harder to save, and saved in worse weather and in more peril from the brig Aquila, decreed 27 per cent. on the dry, 42 on the damaged por-

tion. and 50 on the materials. These were saved in worse weather and with more labor and risk in proportion to the net value; and this case is, I think, hardly a fair precedent. Returning to the usual rate of salvage for saving cotton, as declared in the case of The Ocean Belle [supra], and the increased value of the property as compared with the bulk saved and the labor of saving it, we may well inquire if there is any sound reason for not following, as nearly as we may be able, the usual rates there declared. In the same opinion the learned judge says: "It is believed that no vessel or cargo has been lost on this coast in many years in consequence of an insufficient supply of wrecking vessels and men to save them." Can the same truthfully be said now? If not, the danger of tempting too many to the business of wrecking cannot be declared to be imminent, and it may not be claimed that the rates of salvage should be reduced on that account. The circumstances of large values saved by the wreckers, the numerous wrecks, and the then unusually high price of cotton saved, together with the fact that most of that saved was not in danger of immediate loss or greater damage,—all of which, at the time of the decrees on the cargoes of The Waltham, Harwood, Nesmith, and others in the fall of 1865, served to induce and justify a reduction of the rates of salvage,—are none of them found in this case. It is true that the price of cotton is now higher than when the decree of The Ocean Belle was rendered, but the price of labor, the value of vessels and their equipments, and all of the actual necessaries of life have likewise increased, and I can see no good reason for reducing, in parallel cases, the rates established. These cases cited have been the most recent, and, in fact, the only recent, cases that may be justly claimed to be parallel.

Referring again to the case before the court, I think that 35 per cent. on the net value of the cargo and 45 per cent. of the materials saved, after deducting the usual costs, charges, and expenses, is a reasonable salvage. This does not amount to quite what Judge Marvin declares to be the usual rates, but is, as I consider, a fair and liberal salvage and reward for the services rendered. Of the small amount of brass stripped from her bottom, and other small articles of materials saved from the entire abandonment by both master and original salvors, I do not consider, in view of the small amount and labor in obtaining it, 60 per cent. to be too much. In this case, as well as several of the more recent cases decided in this court, the attention of the court has been called to the fact that many of the smaller class of the vessels have been employed, and but few of the larger class (such as were found here years ago), have been engaged, and suggestions desired in regard to the practicability of discriminating, in giving salvage, between vessels of the smaller class, or larger ones, more

capable and efficient. Circumstances entirely distinct from wrecking have removed, in a great degree, this class of large and valuable vessels from the reef, and while I might desire to have them restored, the question naturally arises how is this end to be attained, and what effect would the discrimination suggested have? There is now a distinction made which reaches the masters and mates of the smaller vessels, and nothing now can be done but touch the per tonnage rate itself, or declare that the salvage of smaller vessels should be diminished or that of the larger increased. What can be done? I am not ready to believe that diminishing the salvage awarded to smaller vessels for valuable services would, bring to our coast a large number of fine, efficient vessels, nor am I ready to say that I will, on account of large vessels, unconditionally increase the salvage decreed them. Small vessels are not capable of rendering as efficient service as larger, and where their services are less valuable, they consequently earn less; and I shall, at all times, discourage and object to the employment of smaller vessels to the exclusion of larger, but in the absence of larger, what is earned by them then they are entitled to, being held at all times to a strict compliance as far as possible with the established rules of the court.

Decree accordingly.